We'll call the case of EHI Acquisitions v. United States, Mr. Adams. Good morning. Good morning. Mr. Adams, whenever you're ready, sir. And your honors, with the court's permission, I'd like to reserve five minutes. Sure. This appeal turns on the answer to the following question. What did the parties to the 1983 indenture intend the phrase and offer to mean? And that phrase, as your honors are aware, is used in the context of a contract involving the transfer and conveyance of property. Under the law, the party's intent is found in the ordinary meaning of the word. Mr. Adams, do you think the contracted question here is clear? Yes, your honor. You do? And well, let me ask, well, if you mean clear, you mean clear intent? The language, is it because the language is the intent of the parties, right? Is the intent of the parties clear from the documents? Yes, absolutely, your honor. And let me explain why I say that. When we're talking about what they meant by using that phrase in that particular paragraph, which is paragraph eight of the indenture, the parties used the phrase and offer to convey. In this context, the document involves the transfer of land for free in the first page of the indenture. That's clear. And then it expressly says, we're not going to transfer the land as a gift, of the improvements as a gift. So, the first paragraph says government, you get the land as a gift, but you don't get the improvements. So, the intent from that language is that the parties intended to treat the improvements in some way different than the land. And how do we figure out what they intended with respect to the improvements? Immediately after they grant the land for free, they set up a retained use of state. And then the remaining paragraphs, the bulk of this document sets forth commercial terms that talk about the rights and the obligations of the parties to address how to run this for-profit entity, the resort. It is within that paragraph, it is within those commercial provisions that they set up what we call a put provision in paragraph eight. Now, one of the things that the parties have never really discussed is this, when the parties drafted the 1983 indenture, that document says nothing about what happens to the improvements at the end of that 40-year term. It's silent on it. So, now you have to question, what did the parties intend when they put their names on the dotted line on that document? At the end of the 40-year terms, here's what they intended. If it reached the 40-year term, the land is with the government, the improvements are with the owner of the improvements, but there's no retained use of state, you cannot operate. Say again, there's no retained use of state, you cannot operate on there. So, if you just look at that document, and I raise this for reason, Your Honor, if you look at the document, at the end, the land and the improvements are in the hands of two separate entities. But they set up a provision in the middle, something to happen before you get to that end. And that's the put provision in paragraph eight. And what they say is, the person who owns this resort, the improvements, can do something to terminate that retained use of state early. Before you go further, what happens if the rule is not terminated early? If it expires, if it lapses, what happens to the improvements? Ultimately, Your Honor, because there was a document that was drafted in 1986, three years later, there was another document that was drafted in 1986. That document speaks to what happens at the end of the 40-year term to the improvements. And in that document, what the party said was, at the end of this term, the owner of the improvements conveys over to the government, the improvements. But it expressly says, unless something happens under paragraph eight. But that conveyance would be without consideration, is that right? Other than the nominal consideration that was set forth in the 83 indentiture. Yes, Your Honor. If the parties got to the end, 40-year term, whoever owned the improvements was obligated to convey it for free. There's no dispute about that. Well, help me, what sense would it make for us to interpret this in such a way that if a commercial entity, and it would be a commercial entity that has the rule to develop the concessions, if that commercial entity allowed the rule to lapse, it then conveys back, it doesn't have to convey actually, by force of the 83 indenture, the rule would basically, the ownership interest in the rule would go to the government of the Virgin Islands for free without a consideration. But if they terminate it early, they sell it at a cost which is nowhere listed in any of the documents. There's no way of determining what the cost would be in any of the documents. Why would any commercial entity give for free at the end of 40 years, something that they could sell if they acted before the 40th year expired? What sense does interpretation make? Well, your honors, there are two answers to that. One is, it's possible that an entity that acquires this property under the current contract may choose, as JSPI running that resort was going to choose, may choose to give it over. That's one. Give it over for free? Yes, that's one. How realistic is that? It's not realistic, your honor, but I'm trying to answer the question to be, to just give you the broad parameters. It's possible, but it's not realistic. The question becomes, why did they do what they did knowing, and by that I mean set up that put provision, knowing that there was the opportunity for the owner of the RUE to assign it to a for-profit? And what we put in our papers is the evidence that says when they used the phrase, an offer to convey, it was in its plain meaning. It gave the owner of the improvements the right to either give it over for free or get consideration, and that makes sense in the context of possibly JSPI would retain it and get to the end and turn it over, and possibly it would be sold or assigned to a for-profit, who, by the way, your honors, there's evidence in the record, the for-profit comes in, spends money, raises capital, makes alterations with the expectation that they could recoup that investment. Your honor, it is not absurd for the two entities to set forth a provision that says it may be the case that this for-profit entity may want to make an offer, good faith offer, fair market value offer, your honors, and say, I want out early. Respectfully, your honors, there's nothing absurd about that. And the key principle here, your honors, is this. The parties are bound by the ordinary meaning of the words they put in the document. In any other scenario, your honors, I would say this is a straightforward application of well-established rules of contract interpretation. Let's assume we see it differently, so to speak. So walk me through this hypothetical. Let's assume we think there's some ambiguity here, that the terms aren't as clear as you're suggesting they are, and we turn to other documents to determine the intent, as it were, and the other documents might be the press release, those sorts of documents. What do we do? Do we interpret the contract using those documents in the first instance, or would we remand it to the district court to have the district court do so? Two points I would say you would remand, but I also say for this court that if you were to look at those extrinsic sources, those sources do not, they do not, they're not the appropriate sources, the sources in the record, to address the issue that's at hand here. We're not talking about, look, because you don't look to the extrinsic sources to determine what the intent of the parties are. What are they intent? You look to it to see that they talk about how this word, an offer, is used in the context of this 1983 indenture. None of the extrinsic evidence, your honors, speak to that at all. None of the extrinsic evidence tells what the parties intended an offer to mean. So we're at that situation where there's no evidence in the record, extrinsic or otherwise, that the court, I believe, properly can look to to see what the parties intended. And your honors, respectfully, when you apply the rules of construction, the government agrees, the The only dispute, your honors, is what source we're looking at. They're looking at general dictionaries. We say it's a term of art, but we all land in the same place. Ordinary meaning includes the right to offer for free or for consideration. We all land there. The question becomes, what do you do after that? The government, the district court, chose to construe this contract as an entirely philanthropic contract. And because of that, they decided, well, I believe the intent was to give. But, your honors, the district court erred because this contract is not entirely philanthropic. I'm sorry, it's not? Entirely philanthropic. It's not entirely a contract of a gift. Well, but inconsistent with what the district court reasoned, it, to the extent that it's not entirely philanthropic, isn't that because you've got to operate a concession on the land. And that's, if you don't realistically set forth some mechanism for that to be done in a profitable way, concessions aren't going to be operated. Because, and it looks like Rockefeller's contemplation was, the government of the Virgin Islands simply may not be able to afford to run the concessions. And therefore, you've got to allow for some independent profit motivated entity to come in to run the concessions. And that's why the rule was there. That's correct, your honor. Now the question becomes, what does that, how does that, how does that affect, how does that in any way shed light on what the impact, what the import of the words that they put in that contract mean? And, you know, I appreciate, your honor, that this elephant in the room, which is, you know, why would we want to give this, this National Park over to this for-profit? You know, why would they set it up that way? Your honors, the parties, when they entered into the agreement, they had choices to make about what words they put into that document. One choice they made was that they were going to expressly exclude the improvements, the resort from the gift. That's the first very important point that they made. They excluded it. But that kind of puts the rabbit in the hat, because as we discussed earlier, the exclusion is only during the period of the rule, and if the rule terminates, then that those concessions would go back to the government of the Virgin Islands without consideration. We agree on that. Unless, of course, and we get back to your honor's initial question about why does it make sense? Does it make sense? Unless, of course, something happens before that. We're really talking about how do you square paragraph eight? How do you square that put provision, right? Where it's set up so that a commercial entity, and your honors, I've gone over my time. Go ahead, go ahead. Okay, sorry. Where they've put a put provision, a contractual term that the parties understood would be followed by a for-profit entity, and they used precise language. Well, that's both ways. They used very precise language, and if you look at the A through F subparagraphs of paragraph eight in the 83 indenture, they talked about any notice of termination has to include a specific termination date. The date must be after September 30th. The termination must include, and this is what we're arguing right now, an offer to convey all improvements. It must include notice of the instrument that terminates has to be given to the grantee. There's no mention in there about how the notice, the offer, must include either any reasonable for market consideration, nothing like that. It's hard, at least for me, to read those subparagraphs under paragraph eight and conclude that they intended that offer to include something that was not spelled out in the details of paragraph eight, which tells what the offer has to include. There's nothing in there about consideration. And your honor, that's why I said that they use precise language. And let me explain what I mean by that. One thing they could have done in that paragraph, your honor, they could have said that notice of termination shall include an offer for free. It could have said you shall convey. It could have said you shall offer. If they had used words like you shall offer, you shall convey, you shall make an offer for free, then yes, it would be clear. The question becomes, if you want to get consideration, do you have to say an offer for consideration, an offer for value? Do you have to say that? The reason I said they use precise language, your honor, is because when you're looking at the words of a contract and you're going to hold the parties to those words, you've got to construe the phrase properly. The phrase is not offer in the verb context. It's you have to make an offer. And what we've described to the court, what all parties agree is when you construe an offer, noun part of that phrase, the noun, an offer, and you pair it with that offer has to be accepted. In that paragraph, the question is, without the other language around, without for free or without for value, what does an offer mean? What does it mean? Your honors, it means unambiguously that the person who owned the room and was making that offer had the right to either offer it for consideration. How is that? That itself is an ambiguity. You've just acknowledged that it can be an offer for free or an offer for consideration. So if it can be either, can't we turn to the extrinsic evidence to determine which of those two options the party's intended? And your honors, in our opening brief, and I think maybe in our reply, we say to the court that the case law that goes against exactly what you just said, the fact that it's either or, the fact that a phrase can be construed to be an A or a B, doesn't make it ambiguous. It doesn't lend to ambiguity. It doesn't. So the question now becomes, and your honors, even if it were, what I'm suggesting to the court is this. Every party, the government, well, the court is not a party, but the government, in all of their briefings below, they concede it's not ambiguous and they give it a meaning. I've seen them argue that it is unambiguously, it unambiguously means an offer for free. Right. What they do is they give it a meaning, your honors, and the meaning they give is to offer something for acceptance. When every source that they look at, when the courts are going to look to see how we define this, they look to general, every source gives it a meaning, an act, or giving something for acceptance. And they not only give it that meaning, but they say that meaning includes both the ability to give it for free and the ability to ask. And they all conclude, the government did, the lower court did, that's not ambiguous. There's no ambiguity there. So now you have to figure out, all right, is it the case, as the law says, that unless the parties use a phrase that allows for an A or B, that's the intent of the parties. That's what the parties intended. That's what the law says. You stop there. But your A or B would put the offeror in a position to say, I want to offer this to you $100 million or $200 million. And there's the offer. And if they say no, well, then I get to keep it. And that's exactly my problem. Because you could make an offer, say the commercial enterprise wants to keep it, and they know they can keep it if they make an offer that's refused. So they make an offer, and they come up with some outrageous sum of money, knowing it's $3 billion, knowing it's not going to be accepted. So it isn't accepted, it's rejected. Well, you've made the offer, and now we get to keep it. That's my concern. And your Honor, the answer to that question is this. The law in the Virgin Islands imposes upon every party to make a good faith offer. So your Honor, if it were the case that EHI pulled a number out of the hat. Good faith is not in paragraph 8A, though. If the real good faith offer were in there, then I think you're in a very different ballgame, because that implies a fair market consideration. That's missing. That's where I went to the sub-paragraphs in paragraph 8. It's implied in the law, your Honor. So to answer your question, if it were the case that a non-good faith offer was made, $7 billion, some number that was not fair market value, we wouldn't be before your Honor. And that's because the answer to the question, the offer from the government, wouldn't have been, well, you have to make an offer for free. It would have been, your offer is not in good faith. But we only get to the good faith question if we agree with your premise that an offer for consideration is contemplated by the contract. So if, as the government argues, a contract, and as the district court found, the contract unambiguously only permits an offer for no consideration, then good faith falls out of this entirely. Well, if the court concluded that there was no way to construe this phrase so that it can include an offer for consideration, then yes, the good faith requirement goes out, because it had to be for free. But I want to suggest to the courts, this is, to your Honor, this is what happened below, and this is what the government argues. Once you get to the point where you reach, and they've reached, the unambiguous meaning, and they concede it can go either way, now you've got to figure out why go one way versus the other. And the lower court did this, and the government argues this. They do it because they say it's used in the context of a document that is entirely philanthropic. And I will concede to your Honors, if we were looking at a document that was a gift, a full gift document, and you are now faced with, we've got this phrase, an offer, and it could be either A or B, in that context, if it was entirely philanthropic, I concede it would be reasonable to conclude that the parties meant the A. That's not what we have here. We don't have that here. We've got an error B in a document where the phrase is not used in the philanthropic context. It's used in a completely commercial context. And what that says, your Honors, is this. To elaborate upon that point, the phrase you're talking about is offer, and when you say in a completely commercial context, what is the context you're talking about? Is it the transfer of the root? It's in the provision of the contract that starts at paragraph three. Paragraph three, four, five, six, seven, eight. All of those paragraphs, your Honor, they set forth entirely commercial provisions. It says you can have guest facilities, you can mortgage, you can make alterations, you can assign, and you can exit early. Those are all commercial, your Honor. They're not philanthropic. And if you take that and you put it also in the context of the language at the top that says we're not going to gift the improvements, we're excluding it. The question becomes, why did they do that? Why did they exclude the improvements from the gift? I think we've all agreed that there's one aspect of this indenture that is not commercial, and it's what happens at the end of the 40-year retained use period if there is no early termination. At that point, there is a non-commercial exchange of the title back to the government, correct? Yes. And so the paragraph that contemplates that non-commercial exchange at the end of 40 years is, it cannot be entirely commercial. Well, again, in 1983 indenture, it doesn't say anything about what the parties intended to happen at the end of the 40 years with respect to the improvements. It doesn't speak to that. If you read that entire document, it says nothing about what happens at the end. It's silent on that. The provisions that I'm talking about, your Honor, are all of the those provisions were set up to ensure the commercial, viable operation of the resort. That's what those provisions are for. When the lower court concluded that the context in which this phrase was used was entirely philanthropic, your Honors, that was error, because it wasn't. And the court ignored all of the commercial provisions in which this phrase that we're that phrase on offer is amongst the commercial part of this contract. But couldn't you have a scenario where, and maybe that's what this is, you have a commercial undertaking in order to ensure the success of the underlying philanthropic gift? Because you're not going to get anyone to come in and give away the hot dogs and the hamburgers and the cheeseburgers. That's a philanthropic, that's not a philanthropic enterprise. That's a profit-driven business. And so you set it up so that you have the, this is the park. But in order to have, allow the park to be enjoyed to its fullest extent, and have the resort operate as a resort so that it can be sustained, you've got to build into it some kind of opportunity for a commercial enterprise to come in and operate it. That's not inconsistent with a gift at the end of those 40 years. Well, it's inconsistent with a gift. What, your Honors, is not inconsistent with a gift at the end of the 40 years. And I just want to make clear that there is no question here that if the operator, whether it was for profit or not, allowed the retained use of state to reach its 40-year term, that under the 1986 indenture, the one that came three years later, that entity was obligated to convey that there was improvements to the government. There's no dispute about that. How would that offer occur? The contract, the 86 indenture doesn't speak to how it occurs. It's just that you have to convey it. So it doesn't have all of the language that the 1983 indenture paragraph 8 has. But the important part of that 1986 is that it leaves in place paragraph 8. It leaves in place this key provision that we're talking about here, which is, again, what happens if a for-profit entity, for example, has expended all of its capital to improve, to make improvements, they chose to get out early. And again, your Honors, I point to, if you go back and you try to figure out what it means, you've got to start. You've got to start with its plain meaning. You've got to look to the dictionary definitions to figure out what the plain meaning of that phrase is. That's where you start. That phrase is offer. It's an offer, Your Honor. And as you were speaking, as you were speaking earlier, I was thinking of a situation. Let's say I'm cleaning out my garage and there's an old riding lawnmower in there that I've never used because I don't want to store it. I want to maintain it. And I'm thinking of selling it. Before I sell it, I thought, well, maybe my neighbor can use this thing. So I knock on the lawnmower. I don't intend to use it. I think it's honorable. I might have to put some money in it. If you want it, it's yours. Well, that's an offer, but I'm not anticipating any consideration for that offer. I'm saying, look, if you want it, send the garage, come and take it. That's an offer. And that's an offer, Your Honor. Why isn't that any different than the offer we have here? I'm not contemplating anything other than a gift in that situation. Because in your context, Your Honor, in your context, hopefully you and your neighbor are Otherwise, I wouldn't give him the damn lawnmower. Well, Your Honor, it could be that. It could be somebody comes to your home and you offer them water, right? In that context, it's expected that you're not going to charge somebody for water. The words that you use when you convey your offer to your neighbor, it's important. If you say to your neighbor, I'm going to offer it, come, you can get it. Those words are important. If you have to construe them, they would probably be that you intended to give it for a gift. Context is important. In the context of this contract, sophisticated parties, and we've got to presume that the government, when they were negotiating this, had their lawyers, Lawrence Rockefeller had his, they chose to use the phrase, you've got to make an offer that has to be accepted. In any contract, Your Honor, in any contract, where an offer, an acceptance, any document is compared, that carries a specialized meaning. If it's compared, if it's coupled with consideration. Well, Your Honor, an offer and acceptance equals consideration. Well, not if the, not if I offer a gift. In my lawnmower scenario, I'm offering it, it's accepted, but there's no consideration there. And one of the things, Your Honor, that the court, the lower court didn't address, and that's important, is if you're going to put a document and you're going to make a gift, it's got to be clear. It's got to be unmistakable. It's got to be unequivocal. The language in that present document has to be clear, unmistakable, unequivocal. So for purposes of this, the government needed to say, the parties needed to say, I'm going to make you an offer for free, an offer of a gift. That's how you address that issue. Absent that language, Your Honor, now we've talked about, well, what does it mean when you don't include that language? What does it mean when you just say an offer and you pair that with acceptance? Again, an offer to convey must be, that has to be accepted. Under normal contract interpretation rules, Your Honors, you land on an unambiguous, ordinary meaning that allows for proposal for consideration. And the only way you get away from that, the only way you get away from that is if there's extra words in that document that says it's a gift, as I've just explained, or the context in which it's used suggests that it's a gift. And I know there's this, because the lower court did it, and I'm not going to say that this is an easy situation, but we've got a document in which Lawrence Rockefeller is giving land. And it's almost easy to say this is entirely about giving land for free, but it is not. It is not just about giving land for free. It's about giving land and excluding and retaining the right to run a for-profit business, expressly doing so. And so the question becomes, in that document, what did the parties mean? Which way do you go? The context is not philanthropic. The context is commercial. In a commercial contract, Your Honors, offer and acceptance is used. It's a term of art. It means bargain for consideration. That's what it means. That's where you start. That's why you don't have to put those words in the document, because it's ordinary means included. Your Honors, I've spent more time from the court. That's very helpful. Thank you. Thank you. We'll see you on rebuttal. Thank you. Mr. Sleeper. Good morning, Mr. Sleeper. Good morning, Your Honor. Acting United States Attorney Adam Sleeper for the United States. I think a common vein in some of the arguments we saw in the briefs and some of the arguments made today is a misattribution of the current assortment of rights to the context that existed at the time of the 1983 indenture. And what I mean by that is at the time of the 1983 indenture, the government entered into a contractual agreement with JHPI, Jackson Hole Preserve, Incorporated. Essentially, what that agreement was, was for JHPI to give its rights to the government. So I know a lot of the point that has been made here is the improvements were not transferred over. But JHPI did not own the improvements in 1983. JHPI only had a contingent future right in those agreements. And that was then addressed by this provision. So the carve out of the improvements from a contract with JHPI is just not as significant as the plaintiff would like you to see because JHPI did not own those improvements. I want to go to the word offer. And everybody agrees that if you have the word offer and nothing else, it could potentially encompass either an offer for value or not for value. But that's not what we have here. We have a contractual context. And even as we address here, we have extrinsic evidence context. And even the plaintiff here on the stand says, in response to Judge McKee's hypotheticals of the other uses of the word offer, we look to the context. And so what the government submits here is the context shows that this was not a transfer for value. Another good example, if there was even a completely commercial contract, and the parties agreed that in the event of a dispute, the aggrieved party would offer to arbitrate. And if the other party did not agree to arbitrate, a suit could be brought in court. No one would contend that an offer to arbitrate could include a, we can arbitrate if you also pay us a million dollars. And that's what we have here. It says an offer to convey, and they're trying to add additional, very financially problematic terms, $70 million and a waiver of environmental liability, and saying that the conveyance is not just the conveyance. And if you look at the terms of the contract, and I'm looking specifically at the termination or paragraph eight, but also the termination provision. Well, it says offer to convey in paragraph eight. If you look at the termination provision, it says that the land returns, not if the government is not willing to accept the offer, but if the government is not willing to accept a conveyance of fee title, that is the sole thing that the government must accept. And the plaintiff doesn't address that at all. There's nothing about acceptance of an offer. It's an acceptance of fee title. And so adding these... That actually confuses me because I thought fee title was conveyed with the rule was separated out from the fee title, but I thought fee title had already been conveyed. Well, your honor, fee title to the land was conveyed. The rule was retained. Fee title of the improvements was not transferred. JHPI did not have fee title to the improvements at that time. At that time, fee title of the improvements was retained and maybe... And I'm not going to say this is fee simple. I don't want to get tripped up on the language there, but there was a future interest. Yeah, but that confuses me. Heaven knows future interest was never my forte. But you're talking, when you say improvements, you're basically talking about, in addition to the concessions, the buildings. I never heard of fee title being used in that context, fee title to a building. You have fee title to the underlying real estate, but not fee title to a building. Not necessarily an area that I practice in often, your honor, but I also have not heard that as well. But I would say here in this provision that I'm directing the court to, if I just finished the sentence, not willing to accept a conveyance of fee title to the improvements located on the premises. So whether or not that is, strictly speaking, how it should be referred, whether or not that's the right way to structure this, that's what the parties were agreed to. So when we're looking at the intent of the parties, that was the intent of the parties. So... What do you make of Mr. Adams' argument that all the paragraphs leading up to paragraph eight include a lot of commercial terms? I certainly think that the contract between the parties envisioned that there would be ongoing activity on the land during the course of the room, that improvements would be built pursuant to that ongoing activity. And there was a necessity of laying out the between the parties there. Now, what I would say is this. I think my friend on the other side is taking the view that this contract envisions a full 40 years where as many improvements as possible are built on the land. And I don't think that that's really what this was contemplating. This was contemplating, and we can see this in paragraph two, it is grantor's expectation and intention that at some time to be termed by will be terminated and extinguished. The terminated and extinguished language comes from paragraph eight. And so this agreement specifically contemplates that things are going to be terminated early. That's a confusing use of the term because it could lapse after 40 years. But here it says that it will be terminated, not that it will terminate, but that it will be terminated, which would suggest something other than it's going to lapse after the 40 year period. It's confusing. It's not artfully drafted in that sense. Your Honor, my argument will not be that this is an artfully drafted contract. But I think the point being is maybe that actually supports our point. Because what it shows is the parties were contemplating this reaching 40 years. So an argument that there has to be a put provision to ensure that the plaintiff keeps investing in the property until 40 years just isn't consistent with the scheme that's being set up here. And then when there was a transfer to private ownership in 1986 to Rock Resorts, and there was some concern that maybe this would last 40 years, they immediately put in a term to make clear that it certainly can't go any further than that. And so the point the government would make is if we look at first, I think at every step of context, it indicates that this is a transfer not for value. As I described before, if you look at termination provision and paragraph eight themselves, it doesn't contemplate the acceptance of anything other than a conveyance. If you expand out a little bit more to look at how improvements are elsewhere treated in the contract, or excuse me, in the indenture, it says that improvements shall be at the sole cost and expense of JHPI, not the government. It also forbids there from being any mortgages on the improvements, which would prevent any costs for the improvements being transferred over to the United States by that mechanism. At every step in this contract, steps were taken to ensure that the United States did not bear the cost for these improvements. If we expand out even further, we see the philanthropic intent that Crouse emphasized. We see that this says it's in way of a gift, that there's $1 of consideration. We see the intent that it be part of the property, that it composes the park. In fact, that's even an alternative termination clause is if it's not part of the park, then it's turned over. At every step, there's this contemplation of a philanthropic agreement. Moreover, as Judge Crouse highlighted, if more money, if $70 million was needed to be paid to retain the land, land that the government never could really effectively use because it was subject to a retained use agreement, then really is a transfer of the land a gift, or is it something that the government is being asked to pay for? And so none of that is consistent with the commercial contract that the plaintiff is advancing, and all of that is consistent with the philanthropic endeavor that this document contemplates. If we expand out from that, and we look at the pattern of contracting, in as of 1977, the interests were split between JHPI and Coneal Bay, Inc. At that time, JHPI had a future interest in improvements from Coneal Bay, Inc. without cost and a right to all improvements at the end of a lease, or excuse me, at the end of the lease, and was the owner and the lessee of the land. Coneal Bay, Inc. had a current interest in improvements and lessee in the land. So it was contemplated by that contractual agreement was exactly what the government is arguing here. There, Coneal Bay, Inc. owned the improvements, could invest in the improvements, and at the end of their arrangement with JHPI, all of those improvements went without cost to JHPI. Let me ask the same question I asked Mr. Adams about, let's assume hypothetically that we find the contract is not clear. What do we do? And what do we make of these other documents that have been referenced? Yes, Your Honor. So I think when we're talking about the extrinsic evidence, I think my friend on the other side misinterprets the case law that he's citing. There's two issues with extrinsic evidence. One is the extent to which you're able to consider extrinsic evidence to determine whether there was an ambiguity, and the second is the extent to which you're able to consider it to resolve the ambiguity. Now, Pennsylvania law, which some trial level courts in this district have adopted, indicates that there are some restrictions on what can be considered when determining whether there's an ambiguity, and that's the case law that the defendant cites. So what I would say is there is no prohibition on considering this evidence if the court looks at the terms of the contract and determines there's an ambiguity. But even there, but the government wouldn't stay there. I think that the evidence that the government submits also is evidence that the court can look at when determining whether there's an ambiguity. Now, I know my friend on the other side says that this is all about intentions and rather than interpretation of specific terms. I don't know how more specific it could be than a November statement of closing by counsel for JHPI, which was one of the parties where they said, titles to the improvements would be retained by CBI for the period of the retained use of state, just prior to the end of which title to the improvements would be acquired by JHPI, and two, JHPI covenanted to offer to donate the improvements to the park service at the end of the retained use of state, describing what they in fact did in their contract. Well, where are you reading from? Where is that? So that appears in the record at, I believe it's JA 115, and that is the statement of JHPI, the person, the entity who the plaintiff, whose interest the plaintiff is succeeding to, their own description in the statement of closing as to what had been agreed to in the contract. Back me up for a minute. So it's a two-step process. First step would be you can go to the documents to determine if there is an ambiguity. And the second step is you can go to the documents to resolve the ambiguity. Yes. Yes. And I think obviously there needs to be some restriction on what documents you can consider in the first instance, because otherwise the two-step process doesn't really make sense. And that's why we have that Pennsylvania case that my friend on the other side is citing saying this limits what you can consider at this step. And Pennsylvania law controls as to how this would. It doesn't, your honor. I will say it has been adopted by one district court case here and one superior court case here. It's not clear how the VI Supreme Court would necessarily resolve this issue. I think I can concede that there will probably be some sort of restriction on what you can consider. The VI Supreme Court has, however, acknowledged that there at least to some extent documents can be considered or extrinsic evidence can be considered to determine whether there's a latent ambiguity. Isn't the Bowler-Udahome case that EHI relies on about what extrinsic evidence can establish an ambiguity as opposed to clearing up an ambiguity? Yes, your honor. Yes, your honor. So what I am saying is these cases that are cited and that my friend on the other side cite are only addressing what can be considered when determining an ambiguity, not resolving. And so my point being, one, we don't think it's ambiguous. We think we unambiguous unambiguously win on the text of the contract. Our second argument would be even if we don't unambiguously win on the text of the contract, there's at very least an ambiguity in the text of the contract. We really don't think you get to the next step. But if the court were to disagree, at the very least, there's an ambiguity when you consider the text of the contract and the extrinsic evidence that even the Pennsylvania law adopted by the trial courts here says that you can consider. I think the most important being that closing statement there. And the last being every single bit of extrinsic evidence in this case points to the government's interpretation being accurate and the plaintiff's interpretation being not. So can we do that? Or is that something that we remand to the district court in the first instance? Well, I think the district court did do it already. You know, there was two holdings. There was one that the contract was unambiguous in favor of the government. And then there was an exploration of the extrinsic evidence and further saying that also shows this. So I think remand would be a bit of a pointless endeavor at this point. I also think, you know, we're on de novo review. Everything is before this court. I don't think there's any real utility in a remand here. And so no, I would say that a remand would not be the way to go. And then I did just want to talk a bit about the rock resorts contract as well. I see that I'm over time. Again, as soon as this was being transferred to a for-profit institution and presumably JHPI realized, well, our intention and expectation as laid out in the contract might be defeated here. They immediately added in a provision to ensure what was contemplated in fact occurred. And that was a transfer without value. All right. And you know, in addition to the November statement of closing counselor for JHPI, I mean, everything about the interaction between the parties indicates that this contemplated a donation dating from the 1982 letter from Rockefeller initiating these sort of discussions or continuing them saying JHPI would also donate the buildings and the other facilities to Keneal Bay at the end of the, or excuse me, to the National Park Service at the end of the retained use period. October joint news release after it was signed saying at the end of the retained use period, the improvements will also be donated to the federal government. A letter from C.W. Fry to Rockefeller, a memo from C.W. Fry to Rockefeller, including in closing a letter sent to Connecticut general regarding a mortgage, the end of the 40-year use of period, the improvements must be tendered to the government without cost. Another memo from C.W. Fry to Rockefeller, which is similar. There's just, what's very unique here is every single bit of evidence out there about the relations to the part between the parties, about the communications between the parties, about what the parties thought they had agreed to. All of it is about a donation. And when you look at the terms of the contract in the whole, all of that as well indicates that this is a transfer without value. The contract is fundamentally a philanthropic document that can, what was contemplated here was a donation of land followed by the transfer of improvements after enough time had passed for those improvements to be built so they could be for the park service. It is not, as the plaintiff advances here, a commercial document seeking to provide the greatest incentive to a for-profit corporation to, or excuse me, a for-profit entity to maintain the retained use of state as long as possible and extract as much value as possible from the property. That is not what was contemplated here. Unless the court has any questions for me, I would ask that you affirm one additional point I would make as well. There was, I believe that the plaintiff is arguing for entry of summary judgment if the court disagrees with the district court on this matter. The government would note that there are, for evidence that's being relied on by the defendant in their brief, not all of it, so there is other evidence there, but there are things pending there that would, should probably be resolved rather than below, rather than this court. So in the event that the court were to disagree, we would ask that the court remand rather than enter summary judgment against the United States. So for all those reasons, the government requested the court affirm the judgment of the district court. Thank you. Thank you. Any questions from the court before I begin my rebuttal? I have none. Your Honors, one of the, I think, important issues that Judge Restrepo, you've been raising is about this extrinsic evidence, and I just want to make sure the court understands what our position is on that. To the extent that there is an analysis that's done to figure out what the words mean, the courts do allow you to look to extrinsic sources to figure out if the word is ambiguous. Every, at every level, including the briefing by the government, including the analysis done by the district court, when the court did that analysis, and it started off looking at general dictionaries, you know, as the courts are supposed to do, they all concluded that it was not ambiguous. There was no ambiguity. And again, the meaning, which once you find its plain meaning, you're stuck with that plain meaning. The party, that tells you what the intent of the parties is. The plain meaning that the district court landed on, the plain our plain meaning, says that what the parties intended was that the owner of the improvements could make a proposal. If it wanted to, offer it for free. If it wanted to, it could ask for consideration. That's what the plain meaning says. And once you get there, you can't, Your Honors, you can't run away from it unless there's some compelling reason in the document to allow you to do that. There's this issue about the $70 million. I asked the question of myself, what if, what if the improvements as of 2019, when this offer was made, what if the resort had been so damaged that the fair market value was 2 million, was a million, would we be here? Right? The number, it shouldn't shock you because the number is it's fair market value. And so Your Honors. Repeat that again. I'm going to try to follow you there. Yes. The, to the extent that we were having this discussion about, you can make this offer for $70 million and that somehow informs whether or not this is something that you should allow to happen. The number it's, it's fair market value. And that's what the law says. It implies that you can't make this outrageous offer. If it was a $1 million offer, I don't think we would be here as discussing whether or not that's reasonable or unreasonable. If it was its fair market value, the parties, sophisticated parties understood that that was what could happen. A for-profit entity who owned it could make an offer. The extrinsic evidence, Your Honor, speaks nothing of this. It should not be consulted. And the law that counsel, my learned friend talks about says, you got to look to it for a specific reason, for a specific purpose. It's got to be extrinsic evidence that tells you what the parties intended, the words that we're construing means. It can't be about what they expected. And by the way, the language that he quoted, Your Honors, it's about the 40-year expiration at the end. This is about a term that's used in the early termination. Lastly, before I wrap up, there is a provision in this contract, the reverted provision that says, if you make an offer, regardless of how Your Honors construed that term, whether it's for free or for consideration, and it's not accepted, the land goes back to this for-profit entity. So the issue that nobody contemplated the land going back over to this for-profit, that the government loses the land, that it was all philanthropic and it should be in the government's When you look at the language, there is literally language in there that says, if it was a gift and the government didn't accept it, the government loses the land. So the parties understood there could be something that happens here in which the land no longer belongs to the national park. So there's no magic to this reasoning to suggest that it shouldn't go over to a for-profit entity. Lastly, Your Honors, we put in our papers below, we put in the papers to Your Honors, because I think it's important for the people of the Virgin Islands. There is a commitment that has been made by the owners of EHI. After doing surveys, this land will always be in the possession of the people of the Virgin Islands. That is the commitment of EHI. So to the extent that there's any concern about whether or not this is public land, the land will belong to the people of the Virgin Islands. But that's by virtue of the undisputed terms of the 83 indentures, isn't it? Well, what we're fighting about is not the land, what happens on that land. Right. The issue becomes if the land goes over to this for-profit entity because of this early termination provision, what I'm saying to Your Honors is that that land will remain with the I've been doing this, Your Honor, for 30 years. You have my condolences, Mr. Henry. I say this for a reason, Your Honors. I say this for a reason. I've been doing this for 30 years. I practice in the United States. I practice in California. I am what is known as a child of the soil. I was born and raised here. This is the very first time I've ever spoken to a panel in an appellate court. And I appreciate the opportunity to come home and talk to Your Honors and have you entertain my argument. And I thank you. Welcome home. Thank you. You did a great job, Mr. Henry. I'm not saying a winning job or a losing job, but that's the argument for both of you. Really, really good argument. In the case, it is not all that easy, but I really appreciate the way the issue was presented.